**2026 UT App 117**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
HUNTER JOSEPH PONTIFF,
Appellant.

Opinion
No. 20240854-CA
Filed August 6, 2026

Fourth District Court, American Fork Department
The Honorable Roger W. Griffin
No. 221100305

Dallas B. Young and Jennifer Foresta,
Attorneys for Appellant

Derek E. Brown and Daniel L. Day,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1      A short time after Hunter Pontiff and Amanda[1] matched on a dating app, they met up at Pontiff's house. They ended up in Pontiff's bedroom, where they began consensually kissing. Amanda later claimed that during the ensuing encounter, Pontiff choked her, touched her clitoris, penetrated her vagina with his fingers, forced her to give him oral sex, and inserted his penis into her vagina, and she further claimed that Pontiff did these things without her consent.

---

1. A pseudonym.

¶2　　The State charged Pontiff with one count each of aggravated assault, forcible sexual abuse, object rape, forcible sodomy, and rape. The case went to trial, and at its close, the jury convicted Pontiff of aggravated assault, forcible sexual abuse, and object rape, but it acquitted him of forcible sodomy and rape.

¶3　　Pontiff now appeals his convictions on several grounds. For the reasons explained below, we rule as follows:

- First, we agree with Pontiff's assertion that the State presented insufficient evidence to support the aggravated assault conviction.

- Second, we reject Pontiff's assertion that he received ineffective assistance because his trial counsel (Counsel) did not file a motion to merge the forcible sexual abuse and object rape charges.

- Third, we reject Pontiff's assertion that he received ineffective assistance because Counsel did not make hearsay objections to portions of testimony from two witnesses.

- Finally, we reject Pontiff's assertion that he received ineffective assistance because Counsel did not object to the State's use of a "blind expert."

We accordingly vacate Pontiff's aggravated assault conviction, but we affirm his remaining convictions.

BACKGROUND[2]

*Pontiff and Amanda Meet*

¶4     On the evening of October 11, 2021, Pontiff and Amanda matched on a dating app that is targeted toward members of a particular religion. After communicating briefly through the app, Amanda gave Pontiff her phone number and they began texting. While texting, Amanda agreed to go to Pontiff's house, though she told him that she had a homework assignment due at midnight. For his part, Pontiff mentioned that part of him was "hurt" and that he wanted "some physical touch." Based on their text exchange, Amanda's expectation was that she would do homework, after which the two would cuddle and watch TV.

¶5     Pontiff lived with several roommates, and when Amanda arrived, there was a group of people (none of whom Amanda knew) on the main floor talking and watching TV. Pontiff invited Amanda upstairs to his bedroom to work on her homework because it was loud on the main floor. Amanda agreed, and when the two were inside the bedroom, Pontiff closed the door.

¶6     Pontiff offered Amanda a pair of his sweatpants so that she would be more comfortable, and Amanda accepted the offer. Pontiff stepped out of the room while Amanda changed. When he returned, they sat on the bed and talked while Amanda worked on her homework. At one point, Pontiff began stroking Amanda's thigh and buttocks while they were talking, but Amanda told him she was uncomfortable with that. Pontiff said that was fine and stopped. After Amanda finished her homework, Pontiff turned on a TV show and gestured for her to cuddle with him, which she

---

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Meik*, 2024 UT App 46, n.2, 547 P.3d 878 (quotation simplified).

did. They watched the show for a while, at which point they began consensually kissing.

*Amanda's Allegations*

¶7    The parties' accounts of what happened next differ greatly. Amanda's allegations and the associated charges are as follows.

¶8    **Aggravated assault.** Amanda said that while they were kissing, Pontiff started becoming more aggressive, got on top of her, and "placed his hand on [her] throat." She said that he did this "a few different times" and used "pressure" as he did. Amanda later described this as Pontiff "choking" her. Amanda said that the pressure Pontiff applied to her neck was "[n]othing too hard, nothing too crazy at first" but that "it got a little more aggressive" as time went on.

¶9    Amanda said that while this was happening, Pontiff began saying sexually demeaning things to her and that it was like he was "a completely different person." Amanda said that she was initially confused and that she then went into a state of shock. Amanda said that after the period in which Pontiff was choking her, he tried to remove her shirt and the sweatpants. She said that she pushed her shirt back down and resisted Pontiff's efforts to take the sweatpants off. She said that she asked Pontiff to stop attempting to take her shirt off but that he did not stop.

¶10    **Forcible sexual abuse.** Amanda said that Pontiff eventually gave "up on trying to take [her] pants off," at which point he "started just putting his hands in [her] pants." She said that he then put his hand underneath her underwear and began "rubbing [her] very hard in [her] genitals," hurting her.

¶11    **Object rape.** Amanda said that Pontiff then stuck a finger inside her vagina and, as he began progressively inserting more fingers, counted up as he told Amanda "how many fingers he was

sticking in [her] vagina" until he eventually had all of his fingers inside of her. She said that Pontiff then "move[d] his arm back and forth inside and out of" her while making more sexual comments, telling her at one point that "he wanted to make [her] bleed." Amanda said that she did begin bleeding and that she became "[v]ery vocal" about the fact that she was in pain. Instead of stopping, however, Pontiff told Amanda to be quiet, and he put a pillow over her face to quiet her cries. Amanda eventually pulled away and told Pontiff to stop.

¶12    **Forcible sodomy.** Amanda said that around this point, Pontiff took off his clothes. She said that seeing him nude "heightened the shock" that she was already experiencing and that her memory of the later events became "a lot more hazy." Amanda said that Pontiff then forced her to perform oral sex on him.

¶13    **Rape.** Amanda said that there was a brief lull during which Pontiff watched TV and she retreated to the corner of the bed. Amanda said that Pontiff then turned toward her, aggressively pulled her on top of him, pulled the sweatpants and her underwear down to mid-thigh, and pressed his penis against her vagina. She later said that she "felt [the] pressure" of his penis "going in" her vagina and that it had "passed the point of the outside of [her] vagina."

¶14    Amanda said this act shook her out of her shocked state and brought her back to a "sense of . . . clarity," at which point she knew what was going on and realized that she needed to get out of the situation. Amanda said that she pulled away, got off the bed, changed out of Pontiff's sweatpants, and gathered her belongings. She said that as she did this, Pontiff's demeanor changed back to how it had been at the beginning of the night. Amanda said that Pontiff told her that she needed to calm down and that everything was okay. Pontiff eventually opened the

bedroom door and led Amanda downstairs. Amanda said that he didn't walk her to her car because it was raining.

*Amanda's Discussions with Friend and Ex-Boyfriend*

¶15    After leaving Pontiff's house, Amanda went straight to the house of a friend (Friend). Friend later said that Amanda seemed distraught and that it looked like Amanda had been crying. Amanda relayed to Friend some of what had happened, though Friend thought that Amanda's account was somewhat jumbled. Amanda then went home and removed her clothes to shower, and she noticed blood on her underwear. After showering, she changed clothes and got into bed. She spent most of the night crying.

¶16    The next morning, Amanda called an ex-boyfriend (Ex-Boyfriend), and she later explained that she did so because she felt comfortable talking to him about what had happened. Amanda was "pretty hysterical" and "very emotional" on the phone, so Ex-Boyfriend decided to go to her townhouse. When Ex-Boyfriend arrived, Amanda was sitting on the couch staring into space, and she seemed disoriented and confused. Amanda had been crying a lot, was in a lot of pain, and had an ice pack on her genital area. She later said that she was having some trouble breathing at this point. She also recalled she was in constant pain, particularly in her genital area.

¶17    Amanda told Ex-Boyfriend what had happened the previous night, which prompted Ex-Boyfriend to call a religious leader who was also an attorney to ask him for advice. After speaking with Ex-Boyfriend, the religious leader spoke with Amanda on the phone. The religious leader then advised Ex-Boyfriend to take Amanda to the hospital.

*The Sexual Assault Examination*

¶18    Ex-Boyfriend drove Amanda to the hospital and then waited for several hours while she was seen in the emergency room. After Amanda gave a brief description to emergency room personnel of what had happened, she was taken to a room for a sexual assault examination. The medical staff collected her underwear, which was not the same underwear she had been wearing during the assault, and this underwear also had some blood on it. The nurse examiner who conducted this examination (Nurse) found petechiae on Amanda's neck, which are small bruises that are caused by external force to the neck and are consistent with strangulation. Nurse found an acute abrasion on Amanda's labia that was consistent with the use of force and digital penetration, as well as erythema (or redness) on Amanda's cervix.

¶19    During this exam, Amanda did not report that she was experiencing any throat "pain" (though she did report some "tenderness" in her neck), nor did she report suffering from loss of consciousness or loss of memory during the alleged assault. While describing the events of the previous evening, Amanda told Nurse that she "could still breathe" when Pontiff had his hand around her neck, although she said it was "uncomfortable" to do so. The next day, Nurse called Amanda to follow up, and Amanda reported some coughing, a headache, and throat pain.

¶20    After the sexual assault examination, two officers picked up the sexual-assault evidence kit and asked Amanda if she wanted to talk, but she declined. A deputy (Deputy) gave Amanda his card and told her to contact them if she later wanted to talk.

*The Aftermath*

¶21　During the next few days, Friend observed bruises on Amanda's neck and legs, and Amanda complained to Friend that she was struggling to breathe and that her neck was bothering her. Over the next few weeks, Amanda told Ex-Boyfriend that her "throat hurt a lot" and that she was having some trouble breathing.

¶22　About a week after the incident, Amanda saw her primary care physician, and she relayed her version of the events described above. The doctor ordered an x-ray of Amanda's neck because her throat was hurting and he was concerned that her hyoid bone might be broken. The x-ray showed no acute trauma. Three days later, Amanda met with her OB/GYN. During that appointment, she disclosed the sexual abuse and reported feeling throat and pelvic pain.

*The Charges*

¶23　About a month after the alleged assault, Amanda gave a statement to the police, and a detective (Detective) soon interviewed Pontiff. The State later charged Pontiff with aggravated assault, forcible sexual abuse, object rape, forcible sodomy, and rape.

*The State's Case*

¶24　The case went to a jury trial. In its case-in-chief, the State called several witnesses, including Amanda, Friend, Ex-Boyfriend, Nurse, and various other medical providers. In addition to testifying about the events recounted above, witnesses gave the following testimonies that are particularly relevant to the issues raised on appeal.

¶25   During Amanda's direct examination, the prosecutor asked whether it was "concerning to [her]" when Pontiff "started to apply pressure to [her] throat." Amanda responded, "I was just more confused, but no, not necessarily." The prosecutor then asked Amanda to say "a little bit more about" that, to which Amanda responded, "Well, I mean, I think it's normal for humans to be able to hold their breath and, like, not breathe for a couple seconds, which is the manner he was holding my neck. It definitely wasn't comfortable, but it wasn't something where I couldn't breathe." On redirect, Amanda was directly asked whether she had lost consciousness when Pontiff's hand was on her throat, to which she responded, "I didn't lose consciousness. I don't remember losing consciousness." Amanda also testified that it "never crossed [her] mind" that Pontiff was choking her "to hurt [her]" and that she "never felt like [her] life was in danger." And she further said that there was no point during the choking when she "wasn't still awake."

¶26   During his testimony, Ex-Boyfriend recounted Amanda's phone call to him the morning after the assault. During this portion of his testimony, Ex-Boyfriend said that Amanda told him, "I went with a guy last night, and he raped me."

¶27   During her testimony, Nurse said that petechiae are "typically the result of application of force." Nurse testified that Amanda had said that her "[b]reathing was normal during [the] assault" and that she felt "no changes" in her throat "during the strangulation/suffocation."

¶28   During his testimony, Deputy talked about his conversation with Amanda at the hospital after the sexual assault examination, during which, as noted, Amanda had told him that she did not want to report anything at that time. During this exchange, the prosecutor asked whether Amanda ever said, "I wasn't raped" or "I wasn't sexually assaulted," to which Deputy responded, "No."

¶29　Finally, the State called a "blind expert" on sexual-assault trauma (Expert).[3] Expert testified that she did not know Amanda and had not reviewed any materials or underlying testimony related to this case. Expert then talked about various ways that people respond to trauma generally and sexual assault in particular. Expert explained that in response to trauma, the brain often disconnects and operates on instinct, with automatic responses including the fight, flight, freeze, and fawn responses. Expert opined that the freeze and fawn responses are the most common responses to a sexual assault. Expert explained that in the context of sexual assault, freezing can look like going limp or being dormant, while fawning involves leveraging the relationship to try to reduce harm. Expert explained that acting in a way to avoid embarrassment is part of the fawn response, and Expert observed that religious beliefs can lead to submitting to sexual assault and not reporting as a means of avoiding humiliation or being cast out of the community. Expert also discussed how trauma affects memory, wherein some events are remembered in detail while others are forgotten. Expert explained that it's common for people to remember certain physical acts but not recall things that happened between those acts.

*The Lesser Included Offense Instruction and the Defense's Motion for a Directed Verdict*

¶30　After the State presented its case, and outside the presence of the jury, the parties discussed jury instructions. Counsel asked whether the State was presenting the forcible sexual abuse charge

---

3. The term "blind expert" is often used to refer to an expert who is unaware of the facts of the case at hand but nevertheless offers generalized testimony about relevant principles or concepts. *See, e.g.*, *State v. Mendoza*, 2025 UT App 140, ¶ 17 n.4, 585 P.3d 49; *State v. Garcia*, 2025 UT App 119, ¶ 13, 576 P.3d 1111, *cert. denied*, 581 P.3d 555 (Utah 2025); *State v. Francis*, 2025 UT App 104, ¶ 77, 575 P.3d 1197.

as a lesser included offense for the object rape charge or as a separate offense. The State clarified that it was charging Pontiff with forcible sexual abuse as "a separate count than object rape for [the] touching prior to [digital] penetration." Counsel acknowledged this and made no further argument on the matter.

¶31    During this same discussion, Counsel moved for a directed verdict on all five charges, briefly addressing each charge in turn. In response to the defense's motion relating to the aggravated assault charge, the State argued that during "the choking," there were "physical indications of restriction on blood flow," which it asserted was an "essential element[]" of that charge. The district court denied Pontiff's motion in its entirety, concluding that there was "reasonably credible evidence, which, if believed, would sustain a verdict" on each charge.

*The Defense's Case*

¶32    Pontiff testified on his own behalf. He agreed that he had engaged in many (though, as explained shortly, not all) of the acts Amanda had described, and in his view, Amanda consented to everything that did happen that night. Pontiff explained that he had completed sexual assault trainings in both college and in conjunction with his work as a teacher, and he said that because of what he had learned in those trainings, he had asked permission before he did anything with Amanda.

¶33    Addressing the alleged choking, Pontiff testified that Amanda had agreed that he could put his hand on her neck while they were kissing, and Pontiff insisted that he "didn't ever choke her." Pontiff recalled telling Detective during his interview that he was "not the type of person that chokes someone," and he agreed that he had told Detective that if he were "to do that, it would be a caress."

¶34    Pontiff testified that he and Amanda had kissed for about thirty minutes and that there were times when they had been grinding their genitals together with their clothes on. Pontiff said that Amanda had agreed he could touch her breasts and vagina over her clothes, that she had willingly touched his penis over his clothes, and that she had agreed he could touch her vagina under the sweatpants. Pontiff admitted that he had then "rub[bed] her clitoris with a finger for a little bit," after which he had "put one and two fingers inside of her vagina." Pontiff denied that he had verbally counted as he inserted his fingers into her vagina, and Pontiff denied ever telling her that he wanted to make her bleed. He testified that he felt like Amanda had been "fully into everything [they] did."

¶35    Pontiff testified that Amanda had then specifically agreed to give him oral sex, and he said that after a "lull" in the encounter, they engaged in more consensual kissing and "grinding" with their clothes on. Pontiff testified that he never pulled the sweatpants or Amanda's underwear down, and he said that it was "impossible" that he had inserted his penis into her vagina because their "clothes never came off."

¶36    Several of Pontiff's roommates who were home that night testified on Pontiff's behalf. A few of them testified that the walls in the home were thin and that sound carries in the home. Each of Pontiff's roommates testified that they did not hear any unusual noises coming from Pontiff's bedroom on the evening in question.

*The Closing Arguments*

¶37    In its closing, the State discussed the elements of each charge and the testimony that it believed supported each charge.

¶38    With respect to the aggravated assault charge, the State acknowledged that it was required to prove that Pontiff had impaired "the circulation of blood" or "restricted" Amanda's

breathing by "applying pressure to the neck or throat." The State asserted that Pontiff had done this by "grab[bing]" Amanda "by the throat in the sense that it was hard, that it was forceful." The State also pointed to evidence that Amanda later had bruises on her neck and had told others that she had throat pain and was having trouble breathing. In the State's view, all of this suggested "[t]hat her breathing was restricted" while Pontiff was choking her. In particular, the State argued that the petechiae on Amanda's neck were evidence that Pontiff used "enough pressure to restrict blood flow." During its closing argument, the State did not assert that the force Pontiff used was required to be "likely to produce a loss of consciousness," which was an element of the crime under the statute in effect at the time of the alleged assault. *See* Utah Code § 76-5-103(1)(a)(iii), (1)(b)(ii)(A) (2021). This element was included in the written closing jury instructions, however, and it was read to the jury by the court.

¶39    With respect to the forcible sexual abuse charge, the State told jurors that this charge was based on "the outer touching" of Amanda's vagina—specifically, "the touching that occurred right before [Pontiff] digitally penetrated [Amanda]." After briefly discussing the evidence relating to that charge, the State told jurors that the object rape charge was based on the "digital penetration," meaning Pontiff putting his fingers into Amanda's vagina.

¶40    The State later told jurors that the forcible sodomy charge was related to Amanda's "mouth on [Pontiff's] penis," while the rape charge was based on Amanda feeling "the pressure of his penis" in her vagina and Pontiff putting his penis past "the labia[l] folds, the outside of [her] vagina."

¶41    In the defense's closing, Counsel framed the case as being a credibility contest between Pontiff and Amanda, and he argued that her testimony was not credible, that she had actually consented to the charged acts, and that Pontiff's testimony about

the evening in question made "more sense." Counsel also discounted the testimony of Expert, arguing, "[Expert didn't] know anything. . . . What did the blind expert say? Well, this is what happens generally speaking in trauma. They don't know anything. Nobody knows anything. [Amanda] and [Pontiff] know. That's it."

*The Verdict*

¶42    The jury delivered a mixed verdict, convicting Pontiff of aggravated assault, forcible sexual abuse, and object rape, but acquitting him of forcible sodomy and rape.

ISSUES AND STANDARDS OF REVIEW

¶43    On appeal, Pontiff first argues that the district court erred in denying his motion for a directed verdict on the aggravated assault charge, claiming that there was insufficient evidence to support conviction. When an appellant "challenges the denial of a motion for directed verdict based on the sufficiency of the evidence," this court "will uphold the district court's denial if, when viewed in the light most favorable to the State, some evidence exists from which a reasonable jury could find that the elements of the crime have been proven beyond a reasonable doubt." *State v. Holm*, 2020 UT App 96, ¶ 16, 467 P.3d 934 (quotation simplified).

¶44    Pontiff next argues that Counsel provided ineffective assistance in three ways: (1) failing to request the merger of the forcible sexual abuse and object rape charges; (2) failing to object to certain statements from Deputy and Ex-Boyfriend; and (3) failing to move to exclude Expert's testimony. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective

assistance of counsel as a matter of law." *State v. Popp*, 2019 UT App 173, ¶ 19, 453 P.3d 657 (quotation simplified).

ANALYSIS

I. The Directed Verdict Motion and Aggravated Assault

¶45    Pontiff first argues that the district court erred in denying his motion for a directed verdict on the aggravated assault charge. In Pontiff's view, there was insufficient evidence to show that he "impeded [Amanda's] breathing or circulation in a manner likely to cause a loss of consciousness," which was a required element. We agree.

¶46    "At the conclusion of the evidence by the prosecution, or at the conclusion of all the evidence, the court may issue an order dismissing . . . any count . . . upon the ground that the evidence is not legally sufficient to establish the offense charged . . . ." Utah R. Crim. P. 17(o). If a district court denies such a motion, this court will affirm that denial on appeal "if, upon reviewing the evidence and all inferences that can be reasonably drawn from it, we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. McCallie*, 2016 UT App 4, ¶ 39, 369 P.3d 103 (quotation simplified). "An inference is a conclusion reached by considering other facts and deducing a logical consequence from them whereas speculation is the act or practice of theorizing about matters over which there is no certain knowledge." *State v. Patterson*, 2017 UT App 194, ¶ 14, 407 P.3d 1002 (quotation simplified). "A jury draws a reasonable inference if there is an evidentiary foundation to draw [upon] and support the conclusion." *State v. Bowdrey*, 2024 UT App 113, ¶ 36, 555 P.3d 367 (quotation simplified), *cert. denied*, 561 P.3d 688 (Utah 2024). "In the case of speculation, however, there is no underlying evidence to support the conclusion." *Id.* (quotation simplified).

¶47    Under the version of the statute that was in effect at the time of the incident, and under the particular elements from that statute that were charged in this case, the State was required to prove that Pontiff committed an act "with unlawful force or violence, that cause[d] bodily injury to another or create[d] a substantial risk of bodily injury to another," and the State was further required to prove that this act "impede[d] the breathing or the circulation of blood of another person by the actor's use of unlawful force or violence that [was] *likely to produce a loss of consciousness* by . . . applying pressure to the neck or throat of a person." Utah Code § 76-5-103(1)(a)(iii), (1)(b)(ii) (2021) (emphasis added).[4]

¶48    There was clearly evidence that Pontiff put his hand on Amanda's throat while the two were kissing. At trial, Amanda testified that Pontiff had "placed his hand on [her] throat," and Pontiff testified that he had done so as well.

¶49    There was also evidence showing that Pontiff had used some force when doing so. Amanda testified that Pontiff had used "pressure" when he put his hand on her throat, and she described this as Pontiff "choking" her. At times, Amanda indicated that this wasn't severe force—she testified that the pressure Pontiff had applied to her neck was "[n]othing too hard, nothing too crazy at first," but that "it got a little more aggressive" as time went on. Nurse described finding petechiae on Amanda's neck during the examination the next day, and Nurse testified that this is "typically the result of application of force." And in the ensuing

---

4. We apply the version of the aggravated assault statute that was in effect at the time of the offense. *See State v. Winter*, 2024 UT App 98, ¶ 20, 554 P.3d 355. And as discussed, the alleged crimes in this case occurred in 2021. For clarity, we note that the aggravated assault statute has since been amended, and under the current statute, the "likely to produce a loss of consciousness" element has been removed. *See* Utah Code § 76-5-103(2)(b)(ii).

days, Amanda told various witnesses (including Friend, Ex-Boyfriend, her primary care physician, and her OB/GYN) that she was having pain in her throat or having trouble breathing. Taken together, this was clearly enough to allow a jury to find that Pontiff had used some force.

¶50 And there was also some evidence suggesting that Pontiff had used enough force to briefly impede Amanda's breathing. Amanda testified that she thought it was "normal for humans to be able to hold their breath . . . for a couple seconds, which [was] the manner he was holding [her] neck." Though this testimony could have been clearer, it was at least enough for a jury to reasonably draw the inference that Pontiff had impaired her breathing for a couple of seconds.[5]

¶51 This issue thus turns on whether there was also some evidence showing that the force Pontiff applied to Amanda's neck was "likely to produce a loss of consciousness," which, again, was a required element under the version of the statute that applied to

---

5. Pontiff points out that at various places in the record, Amanda testified that she could breathe when his hand was on her throat. For example, on the same page of the trial transcript where she suggested she couldn't breathe "for a couple seconds," she also testified that while it "definitely wasn't comfortable, it wasn't something where [she] couldn't breathe." And Nurse testified that her notes from the examination indicated that Amanda reported her "[b]reathing was normal during [the] assault" and that she felt "no changes" in her throat "during the strangulation/suffocation."

We take the point. But even so, a jury is permitted to resolve internal conflicts in a witness's testimony. *See State v. Black*, 2015 UT App 30, ¶ 19, 344 P.3d 644. And we think the jury here could reasonably resolve the conflict in Amanda's testimony by believing that Pontiff had stopped her breathing "for a couple seconds" as she suggested.

this case. *See* Utah Code § 76-5-103(1)(b)(ii) (2021). We see no such evidence.

¶52   At trial, when Amanda was directly asked whether she had ever lost consciousness, she responded, "I didn't lose consciousness. I don't remember losing consciousness," and she then said she had been "awake" during the choking portion of the encounter. Nurse similarly testified that, during Amanda's sexual assault examination, Amanda had said that she did not lose consciousness during the incident.

¶53   True, the applicable statutory language didn't require an *actual* loss of consciousness, but it instead required proof that the force used was *likely* to produce a loss of consciousness. Even so, we see no evidence that could reasonably support such a finding. During her direct examination, the State asked Amanda to elaborate on what she meant when she said that Pontiff had become "more aggressive with the choking." Amanda responded that she thought it was "normal for humans to be able to hold their breath and, like, not breathe for a couple seconds, which is the manner he was holding [her] neck." She then testified that "[i]t definitely wasn't comfortable, but it wasn't something where [she] couldn't breathe." Later, Amanda testified that it "never crossed [her] mind that he was" choking her "to hurt" her and that she "never felt like [her] life was in danger."

¶54   These statements seem at odds with any suggestion that Pontiff was using enough force to make it likely that Amanda would suffer a loss of consciousness, and the State has pointed us to no place in the record where Amanda directly said anything to the contrary. Instead, the State argues that because there was testimony suggesting that Pontiff had used enough force to cause bruising and lingering pain in the following days, the jury could infer from this testimony that the amount of force Pontiff used was enough to satisfy this final element too.

¶55    But in our view, this argument falls on the wrong side of the line between reasonable inference and impermissible speculation. Even taking it as true that Pontiff used some force, there was no evidentiary basis for a finding about how much force (whether in terms of pressure or duration) would be needed to make it likely to produce a loss of consciousness. In theory, we think the State could have supported this element if Amanda had said something indicating that she thought she was going to pass out, but she never said anything like that. Or, alternatively, the State could have called an expert to testify about what kinds of force or what kinds of choking would make it likely that a person would lose consciousness. But the State never put on such testimony either. Without any such testimony, the jury was left to speculate. And in our view, such speculation would have run contrary to Amanda's testimony that while Pontiff put some pressure on her throat, it "wasn't something where she couldn't breathe," that she never felt like her life was in danger, and that it never crossed her mind that he was trying to "hurt" her.

¶56    When construing statutes, we must assume that when the legislature speaks, it does so advisedly. And again, in the version of the aggravated assault statute that controlled at the time, the legislature required proof of not just choking, and not just choking that would impair breathing, but instead of choking that impaired breathing and was "likely to produce a loss of consciousness." *Id.* Because we see no evidence that could reasonably support a finding that the final element was satisfied, we reverse the district court's denial of Pontiff's motion for a directed verdict on the aggravated assault charge, and we instead vacate his conviction on that charge.

## II. Ineffective Assistance and Merger

¶57    Pontiff next argues that he received ineffective assistance because Counsel did not file a motion seeking to merge the

forcible sexual abuse charge with the object rape charge. We disagree.[6]

A.    Background law

¶58    To prevail on an ineffective assistance claim, a defendant must show that (1) trial counsel "performed deficiently" and (2) "the deficient performance was prejudicial." *State v. Samples*, 2022 UT App 125, ¶ 58, 521 P.3d 526. "A defendant's inability to establish either element defeats a claim for ineffective assistance

---

6. In his briefing, Pontiff repeatedly asserts that Counsel should have made the motion at the close of the State's case-in-chief, and from there, he asserts that this motion would have resulted in the forcible sexual abuse charge not going to the jury. For this reason, consistent with Pontiff's framing, we'll refer to his claim as being that Counsel should have made a motion to merge the *charges*.

For clarity, however, we note that under our caselaw, while a defendant "can object that charges merge at any time, either during trial, or following the conviction on a motion to vacate," the "court should rule on the objection only if the jury returns convictions." *State v. Lopez*, 2004 UT App 410, ¶ 9, 103 P.3d 153 (quotation simplified); *see also State v. Cheek*, 2015 UT App 243, ¶ 59, 361 P.3d 679 (noting that a district court "cannot assess whether one charge merges into another until the prosecution has presented its case and the jury has convicted the defendant of multiple charges" (quotation simplified)); *State v. Sanchez*, 2015 UT App 27, ¶ 21, 344 P.3d 191 (noting that a district court's determination that merger should occur should be made "after the jury has returned two pertinent convictions"). Indeed, as explained more fully below, part of the merger test that is at issue in this appeal turns on "the evidence actually presented at trial" and "which of the statutory variations were *proved*," *State v. Brooks*, 908 P.2d 856, 861 (Utah 1995) (emphasis added), which indicates that the district court should be concerned with the evidence that supported the challenged *convictions*.

of counsel." *State v. Miller*, 2023 UT App 85, ¶ 25, 535 P.3d 390 (quotation simplified). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim," we can resolve a claim on the basis of either prong. *State v. Popp*, 2019 UT App 173, ¶ 25, 453 P.3d 657 (quotation simplified).

¶59    To establish deficient performance, a defendant must demonstrate that trial counsel's "representation fell below an objective standard of reasonableness." *State v. Sandoval*, 2024 UT App 186, ¶ 19, 562 P.3d 731 (quotation simplified). "The deficient performance inquiry should focus on whether counsel's assistance was reasonable considering all the circumstances," and a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quotation simplified). "Because the decision not to pursue a futile motion is almost always a sound trial strategy," the "failure to make a motion that would be futile if raised does not constitute deficient performance." *State v. Broadwater*, 2024 UT App 184, ¶ 35, 562 P.3d 739 (quotation simplified), *cert. denied*, 564 P.3d 959 (Utah 2025).

¶60    To establish prejudice, a defendant "must show that there is a reasonable probability that," but for the attorney's "unprofessional errors, the result of the proceeding would have been different." *State v. Bonds*, 2023 UT 1, ¶ 53, 524 P.3d 581 (quotation simplified). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quotation simplified).

¶61    As noted, Pontiff's claim is based on Counsel's failure to file a merger motion. The "merger doctrine" is codified in Utah Code section 76-1-402, and it is "designed to protect criminal defendants from being twice punished for committing a single act that may violate more than one criminal statute." *State v. Lesky*, 2021 UT App 67, ¶ 17, 494 P.3d 382 (quotation simplified). Section 76-1-402 "contains two merger tests." *State v. Rodriguez*, 2025 UT

App 84, ¶ 35, 572 P.3d 436 (quotation simplified), *cert. denied*, 588 P.3d 306 (Utah 2026). The first test is found in subsection 76-1-402(1). It "addresses whether the same criminal act forms the basis for multiple criminal charges, and this test is sometimes referred to as 'the same act provision.'" *Id.* (quotation simplified). The second test is found in subsection 76-1-402(3). It "addresses included offenses—predominantly lesser-included offenses, and it is sometimes referred to as 'the lesser included offense provision.'" *Id.* (quotation simplified). In his brief, Pontiff only argues that Counsel should have requested merger under the lesser included offense provision, so we limit our analysis to that provision.

¶62 Utah courts have set forth a "two-step analysis for resolving" a request for lesser included offense merger. *State v. Brooks*, 908 P.2d 856, 861 (Utah 1995). The "first step is a purely theoretical comparison of the statutory elements of each offense." *Id.* This comparison asks "whether the crimes are such that the greater cannot be committed without necessarily having committed the lesser." *State v. Corona*, 2018 UT App 154, ¶ 47, 436 P.3d 174 (quotation simplified). In other words, there is no greater-lesser relationship if "each provision requires proof of a fact which the other does not." *Salt Lake City v. Josephson*, 2019 UT 6, ¶ 26, 435 P.3d 255 (quotation simplified).

¶63 The second step is necessary only when the offenses have multiple variations and "there is a theoretical possibility of a lesser included relationship." *Brooks*, 908 P.2d at 861. Under this step, courts "look at the evidence actually presented at trial to determine which of the statutory variations were proved and whether those variations created a lesser included relationship between the two charged crimes." *Id.* "But even if there is overlap in the statutory elements, if the convictions rely on materially different acts, then one crime will not be a lesser included offense of another." *Rodriguez*, 2025 UT App 84, ¶ 58 (quotation simplified).

¶64    As noted, the crimes at issue here are object rape and forcible sexual abuse. The relevant elements of the two offenses are as follows.

¶65    **Object rape.** Under the version of the statute in effect at the time, a person committed object rape if, "without the victim's consent," the person "cause[d] the penetration, however slight, of the genital . . . opening of another person . . . by any foreign object, . . . including a part of the human body other than the mouth or genitals," and the person did so with the requisite intent. Utah Code § 76-5-402.2(1) (2021).

¶66    In *State v. Heath*, 2019 UT App 186, 453 P.3d 955, we considered the meaning of the term "genital opening" for purposes of this offense. We concluded that "in the context of the object rape statute," the term includes the vaginal opening—and, indeed, that "it is plain that the term 'opening' is not limited to the vaginal opening," but that "the 'penetration' element" is also "satisfied when the penetration occurs between the outer folds of the labia." *Id.* ¶¶ 68, 70 (quotation simplified). We thus held that the defendant there had committed object rape when the evidence showed that he had gone "beyond her labia majora to touch her clitoris." *Id.* ¶ 62 (quotation simplified).[7]

¶67    **Forcible sexual abuse.** Under the version of the statute in effect at the time of the offense, a person committed forcible sexual abuse if, "under circumstances not amounting to . . . object rape," the person "touche[d] the . . . pubic area[] or any part of the genitals of another" with the requisite intent. Utah Code § 76-5-404(1) (2021).

---

7. In a decision issued just a week ago, another panel of this court rejected a request to overrule *State v. Heath*, 2019 UT App 186, 453 P.3d 955, on these points. *See State v. Black*, 2026 UT App 114, ¶¶ 35–48, -- P.3d --.

B.     Pontiff's merger argument

¶68     During its closing argument, the State told jurors that the forcible sexual abuse charge was based on "the outer touching" of Amanda's vagina—specifically, "the touching that occurred right before [Pontiff] digitally penetrated her." The State then told jurors that the object rape charge was based on the "digital penetration," meaning, Pontiff putting his fingers inside of Amanda's vagina. And in his brief, Pontiff acknowledges that this was the distinction between the two charges. From there, Pontiff asserts that the testimony at trial about the touching that occurred before the digital penetration only supported a finding that Pontiff had touched Amanda's clitoris. Seizing on our discussion in *Heath*, Pontiff then asserts that the earlier touching had necessarily involved a penetration of the labial folds, and he further asserts that because that touching had happened "immediately" before the digital penetration, it was "part of the same action" that supported the object rape charge. Pulling all this together, Pontiff claims that Counsel should have argued that the forcible sexual abuse charge should merge with the object rape charge.

C.     Pontiff's argument fails for lack of deficient performance

¶69     Having reviewed the trial transcript, we agree with Pontiff's assessment of the record. Amanda testified that Pontiff "start[ed] by rubbing [his hand] very hard *in* [her] genitals." (Emphasis added).[8] Of some note, she said that this happened before Pontiff "start[ed] to stick his fingers in [her] vagina." Amanda never described any independent act in which Pontiff intentionally touched her labia or pubic area outside of the folds. For his part, Pontiff testified that he began by "rubbing her clitoris

---

8. Neither party has asserted that there was a transcription error, wherein the emphasized "in" should have been transcribed as an "on."

with a finger for a little bit," after which he "then . . . put one and two fingers inside of her vagina." Thus, Amanda and Pontiff both seem to have agreed that the initial touching (which, again, was the basis for the forcible sexual abuse charge) involved Pontiff touching Amanda's clitoris. And Amanda's use of the word "in" suggested that this involved a penetration of some sort.

¶70    In light of this, we see some merit to Pontiff's argument—but only up to a particular point. As indicated, the forcible sexual abuse statute states that a person commits forcible sexual abuse if, "*under circumstances not amounting to . . . object rape,*" the person "touches the . . . pubic area[] or any part of the genitals of another" with the requisite intent. Utah Code § 76-5-404(1) (2021) (emphasis added). And as indicated, we held in *Heath* that where an act of touching the clitoris involves penetrating the labia (and, thus, the genital opening), that act can support a conviction for object rape. *See* 2019 UT App 186, ¶¶ 62, 71. Moreover, in a recent decision, we concluded that *Heath* remains good law and that under its terms, "contact with the clitoris inside the labia necessarily establishes penetration of the genital opening." *State v. Black*, 2026 UT App 114, ¶ 36, -- P.3d --; *see also id.* ¶ 38 (concluding that "touching the clitoris inside the exterior of the labia necessarily means that the genital opening has been penetrated, even if only slightly").

¶71    Together, the forcible sexual abuse statute and our interpretations of it in *Heath* and *Black* indicate that, in a case like this one involving a female victim, forcible sexual abuse of this sort is limited to non-penetrative touching. As a result, given the testimony we've recounted above, it seems that the touching that the State relied on for the forcible sexual abuse conviction (i.e., the touching that occurred before the digital penetration) likely didn't

constitute forcible sexual abuse, but it instead would have supported a conviction for object rape.[9]

¶72 The problem for Pontiff, however, is that this doesn't support the argument he's making on appeal. Again, on appeal, he's arguing that Counsel should have requested statutory merger under the lesser included offense merger provision. As we've indicated, such a motion would fail under the second step "if the convictions rely on materially different acts." *Rodriguez*, 2025 UT App 84, ¶ 58 (quotation simplified). And the animating idea behind this second step is clear enough: since a greater offense necessarily encompasses its lesser included offense, the State can't take one conviction (i.e., a conviction for the greater offense) and arbitrarily split it into two (i.e., one conviction for the greater offense and another for the lesser included offense).

¶73 But that's not what happened here. Instead, reviewing the testimony that was given, we think it's clear enough that Amanda and Pontiff each described two separate touchings. Again, early in her testimony, Amanda said that Pontiff "start[ed] by rubbing [his hand] very hard in [her] genitals," after which Pontiff "[t]hen . . . start[ed] to stick his fingers in [her] vagina." Later in her testimony, she said that Pontiff began by rubbing her clitoris and that he "eventually" used his fingers to penetrate her vagina. Pontiff described things similarly. He said that he began by "rubbing her clitoris with a finger for a little bit," after which he "then . . . put one and two fingers inside of her vagina."

---

9. Indeed, in *Black*, we recently held that where the victim had described a touching of the clitoris that involved penetration of the labial folds, and where that act had then been charged as object rape, the district court correctly rejected a request for a lesser included offense instruction on forcible sexual abuse. *See* 2026 UT App 114, ¶¶ 54–57.

¶74    While the clitoris is located between the labial folds (which is why, under *Heath*, touching it in a manner that involves penetration of the labial folds without consent can support an object rape conviction), the clitoris is a different body part than the vaginal canal. And as indicated, Amanda and Pontiff each described a sequence in which Pontiff first deliberately touched Amanda's clitoris, after which he then deliberately penetrated her vagina with his fingers. Put differently, neither of them suggested that Pontiff only incidentally touched Amanda's clitoris in passing while he was trying to penetrate her vagina with his fingers, nor did either of them suggest that he only incidentally touched her vaginal opening in passing while he was trying to touch her clitoris. Instead, both of them described a sequence in which Pontiff first deliberately touched her clitoris for a brief period of time, after which he then deliberately moved on and performed a separate set of acts in which he inserted his fingers into her vagina.

¶75    For these reasons, Pontiff has not persuaded us that there was a valid basis for merging the forcible sexual abuse and object rape convictions into a single conviction for one count of object rape. If anything, we think the natural import of this record and Pontiff's argument is that the forcible sexual abuse charge could have been charged as a separate count of object rape. But this would not entitle Pontiff to turn these two convictions into one. As a result, we conclude that the merger motion that Pontiff proposes would have been futile, and Pontiff has not persuaded us that Counsel performed deficiently by not making it.

### III. Ineffective Assistance and Hearsay

¶76    Pontiff next argues that Counsel provided ineffective assistance by failing to make hearsay objections to what he describes as two "prior consistent statements that [Amanda] was raped," which he claims were improper because "the defense never rais[ed] an express or implied charge of recent fabrication."

As noted, Pontiff must establish both deficient performance and prejudice, and we can reject his claims for failure to prove either element. *See Miller*, 2023 UT App 85, ¶ 25.

A.    Deputy's testimony

¶77    Pontiff first points to an exchange between the State and Deputy. As noted, Deputy testified about his conversation with Amanda at the hospital after her sexual assault examination, and he told jurors that Amanda did not want to report anything at that time. The prosecutor then asked whether Amanda ever said, "I wasn't raped" or "I wasn't sexually assaulted," to which Deputy responded, "No." On appeal, Pontiff claims that this answer constituted inadmissible hearsay. As he describes it, when Deputy testified that Amanda did not say she was not raped or sexually assaulted, this "cloak[ed] a prior consistent statement in a double negative" and improperly communicated that Amanda "claimed she was raped." Pontiff claims that Counsel provided ineffective assistance by not objecting on this basis. We reject this claim for lack of deficient performance.

¶78    By rule, the term "hearsay" refers to a "statement" that is made out of court and is offered "to prove the truth of the matter asserted in the statement." Utah R. Evid. 801(c). The rule defines the term "statement" as a "person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." *Id.* R. 801(a).

¶79    We see no basis for concluding that the challenged answer here repeated a "statement" made by Amanda. In the exchange in question, Deputy did not repeat anything that Amanda had said. Rather, what Deputy said was that Amanda had *not* made a statement. Pontiff points to no authority that extends the hearsay rule to testimony from one person stating that another person made no statement. As a result, under the current law, this

objection would have been futile, and Counsel therefore did not perform deficiently by not making it.

B.     Ex-Boyfriend's testimony

¶80    Pontiff next points to testimony from Ex-Boyfriend, wherein Ex-Boyfriend said that Amanda had told him on the phone that she "went with a guy [the previous] night, and he raped [her]." Pontiff asserts that this was inadmissible hearsay and that Counsel provided ineffective assistance by not objecting to it.

¶81    As noted, Pontiff must not only establish deficient performance, but also that he was prejudiced by it. And to establish prejudice, Pontiff "must show that there is a reasonable probability that, but for Counsel's unprofessional errors, the result of the proceeding would have been different." *Bonds*, 2023 UT 1, ¶ 53 (quotation simplified). We see no such probability here, and this is so for several reasons.

¶82    First, the statement that Ex-Boyfriend relayed was about Amanda's claim that Pontiff had "raped" her. But as noted, Pontiff was acquitted of the rape charge, which undermines the suggestion that he was prejudiced by this particular statement.

¶83    Second, while this statement did inform jurors that on the morning after the incident, Amanda was claiming that Pontiff had raped her, there was other testimony informing jurors that Amanda believed she had been raped and already believed this at that time. Starting with the act itself, Amanda testified that she "felt [Pontiff's penis] on [her] vagina" and then "felt pressure going in." And jurors also heard testimony that, at a medical appointment a week later, Amanda reported that Pontiff "placed his penis in her vagina."

¶84   As for whether this was consensual, Amanda described this act as happening after a sequence in which Pontiff had aggressively committed various other nonconsensual sexual acts. And with respect to this particular act, she said that it occurred after Pontiff pulled her on top of him "aggressively" and while she was in a state of "shock." Jurors also heard testimony that after speaking to a religious leader who was an attorney the next morning, Amanda went to the hospital and received a sexual assault examination. And jurors heard testimony from various witnesses describing how, in the hours and days after the assault, Amanda was crying and emotional and acting as if she were in a traumatized state. From all this, even without this statement from Ex-Boyfriend, jurors had a basis for understanding that Amanda was claiming Pontiff had placed his penis inside her vagina without her consent.

¶85   We accordingly see no "reasonable probability" that Ex-Boyfriend's single statement about Amanda claiming that Pontiff had "raped" her affected the outcome of Pontiff's trial in any meaningful way, particularly where he was acquitted of that very charge. We accordingly reject this claim for lack of prejudice.

IV. Ineffective Assistance and Expert's Testimony

¶86   Finally, Pontiff argues that Counsel provided ineffective assistance by failing to move to exclude Expert's testimony. Pontiff raises two claims relating to this testimony. First, he argues that rule 702 of the Utah Rules of Evidence does not permit testimony from blind experts. Second, he argues that Expert's testimony constituted inadmissible bolstering. We reject both arguments for lack of deficient performance.

A.   Use of blind experts

¶87   Pontiff first claims that rule 702 does not permit blind experts. This argument is based on the text of rule 702, which

states that "[s]cientific, technical, or other specialized knowledge may serve as the basis for expert testimony only if there is a threshold showing that the principles or methods that are underlying in the testimony" (1) "are reliable," (2) "are based upon sufficient facts or data, and" (3) "*have been reliably applied to the facts.*" Utah R. Evid. 702(b) (emphasis added). Pontiff argues that our supreme court "takes a strict textualist approach with [these] rules," and he then argues that under such an approach, the "use of the conjunctive 'and' makes all three subsections essential elements." In his view, Counsel should have therefore argued that the rule does not permit testimony from blind experts because such experts are, by definition, not purporting to apply the relevant principles or methods to the facts of the case.

¶88    On first blush, there is some textualist appeal to Pontiff's argument. Rule 702 *does* say that expert testimony is admissible "only" if there is a threshold showing that the relevant principles or methods have been "reliably applied to the facts." *Id.* R. 702(b)(3). And by definition, a blind expert is not doing that.

¶89    But the problem here is that Pontiff is making this argument through the lens of an ineffective assistance claim, which means that he must show that Counsel performed deficiently. As discussed above, Counsel does not perform deficiently by failing to make a futile motion. And of note, when an appellate court assesses such a claim, it does so based on the law that was in effect at the time of the action in question. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984); *State v. Hamberlin*, 2025 UT App 131, ¶ 36, 577 P.3d 912.

¶90    At the time of Pontiff's trial in 2024, our supreme court had repeatedly held that testimony from blind experts could be admissible. One notable example of this was *State v. Clopten*, 2009 UT 84, 223 P.3d 1103. There, the supreme court held that under rule 702, a district court can admit expert testimony about "various factors that can affect the accuracy of eyewitness

identifications," and, notably, that such testimony can be admitted even if the expert is not "familiar with the facts of the case prior to the testimony" and simply discusses "the relevant research . . . in more general terms," thereby "allowing the jury to apply the information to whatever degree it sees fit." *Id.* ¶¶ 3, 19. In this sense, the supreme court approved the use of what we've now referred to as blind experts.

¶91    In doing so, the supreme court specifically held that testimony from such experts does not violate rule 702(b)'s requirement that the testimony be "reliably applied to the facts of the case." *Id.* ¶ 35 (quotation simplified). And the supreme court justified this holding, in part, by referring to an advisory committee note to rule 702 that stated that it "might be important in some cases for an expert to educate the factfinder about general principles, without attempting to apply these principles to the specific facts of the case." *Id.* ¶ 36 (quoting Utah R. Evid. 702 advisory committee note).[10]

¶92    The supreme court applied these principles again a few years later in *State v. Perea*, 2013 UT 68, 322 P.3d 624. There, the supreme court held that a district court had abused its discretion when it refused to allow an expert to testify about "the phenomenon of false confessions" and "the factors that can lead to false confessions." *Id.* ¶¶ 71, 73. Moreover, the supreme court held that the proposed testimony should have been admitted in that case even if the expert was not permitted to separately testify about how those principles would apply to the facts at issue. *See id.* ¶¶ 57–58. Thus, as in *Clopten*, the supreme court in *Perea* approved the use of blind experts.

¶93    In light of *Clopten* and *Perea*, as well as the language from the advisory committee note to rule 702 that *Clopten* relied on, the

---

10. This same note was still in place at the time of Pontiff's trial in 2024, and it's still in place in the current rule.

proposed motion would have been futile. As a result, Counsel did not perform deficiently by failing to make it.[11]

B.     Bolstering

¶94    Pontiff next claims that Counsel should have argued that Expert's testimony constituted improper witness bolstering in violation of the principles set forth in rule 608 of the Utah Rules of Evidence and *State v. Rimmasch*, 775 P.2d 388 (Utah 1989), *superseded on other grounds by rule as recognized in State v. Maestas*, 2012 UT 46, 299 P.3d 892. In Pontiff's view, Expert's testimony

---

11. We note that several decisions from this court that were issued after Pontiff's trial have also specifically approved the use of blind experts. *See, e.g.*, *State v. Mendoza*, 2025 UT App 140, ¶¶ 17 n.4, 32, 585 P.3d 49; *State v. Garcia*, 2025 UT App 119, ¶¶ 33, 36, 576 P.3d 1111, *cert. denied*, 581 P.3d 555 (Utah 2025); *State v. Sombra*, 2025 UT App 83, ¶¶ 13, 24, 571 P.3d 1228, *cert. denied*, 574 P.3d 523 (Utah 2025). Indeed, this court recently acknowledged that "testimony is more likely to be admissible if the expert testifies as a blind witness" because "[o]ne of the benefits of doing so—and, particularly, when the jury is informed that the expert does not know the facts of this case—is that this helps remove the perception that the expert is opining on the truthfulness of a particular witness or victim." *State v. Francis*, 2025 UT App 104, ¶ 72, 575 P.3d 1197.

So again, while we acknowledge the textualist appeal of Pontiff's argument, this argument could only succeed under our current law if either (1) the supreme court overturns its past precedents (thereby causing the court of appeals to do the same) or (2) the language of rule 702 is changed in a manner that forecloses such testimony more specifically than the current text of the rule arguably does. In the absence of either event, it seems settled that rule 702 permits the use of testimony from blind experts. And this is why, again, Counsel did not perform deficiently by not making this argument at Pontiff's trial.

about how trauma can affect victims "mirrored" and then impermissibly bolstered various things that Amanda had said.

¶95   But the problem with this argument is that it, too, is foreclosed by controlling precedent. In a post-*Rimmasch* case, our supreme court held that "[r]ule 608(a) does not prohibit an expert . . . from giving testimony from which a jury could infer the veracity of [another] witness." *State v. Adams*, 2000 UT 42, ¶ 14, 5 P.3d 642. In the supreme court's view, *Rimmasch* instead "only bars direct testimony regarding the truthfulness of a witness on a particular occasion," and testimony does "not impermissibly invade the province of the jury or violate rule 608(a)" if it does "not directly address" the witness's "veracity about the alleged abuse in this case." *Id.* (quotation simplified). Other cases have reached similar conclusions. *See, e.g.*, *State v. Kallin*, 877 P.2d 138, 141 (Utah 1994) (holding that the district court did not err in admitting expert testimony when the expert testified that "the victim's behavior was consistent with symptoms that might be exhibited by one who had been sexually abused" rather than testifying "that the victim had in fact been sexually abused"); *State v. Burnett*, 2018 UT App 80, ¶¶ 27–31, 427 P.3d 288 (concluding that because Utah law allows experts to "testify that a victim's behavior is consistent with sexual abuse," an expert's testimony to that effect was admissible and "trial counsel was not ineffective for failing to object to these portions of [the expert's] testimony" (quotation simplified)); *State v. Christensen*, 2016 UT App 225, ¶¶ 28–29, 387 P.3d 588 (holding that because an expert did not testify to "the ultimate legal conclusion" that the victim was sexually assaulted, the expert's testimony that several of the victim's "symptoms were consistent with" post-traumatic stress disorder was admissible).

¶96   As indicated, this is precisely what occurred here, where Expert testified on a general level about various phenomena relating to trauma victims, but where Expert did not directly opine on Amanda's credibility (and indeed had no basis for doing

so, given that Expert testified as a blind expert). In light of this, the proposed motion would have been futile, and Counsel therefore did not perform deficiently by not making it.[12]

CONCLUSION

¶97    We conclude that because there was insufficient evidence to show that Pontiff used force that was likely to cause a loss of consciousness, the district court erred in denying Pontiff's motion for a directed verdict on the aggravated assault charge. We accordingly vacate Pontiff's conviction on that charge. But we reject Pontiff's remaining claims (all of which allege ineffective assistance of counsel) for lack of deficient performance or prejudice. We accordingly affirm his remaining convictions.

———————

12. At the close of his brief, Pontiff invokes the cumulative error doctrine, but he only does so with respect to the hearsay and expert testimony claims. Of note, Pontiff does not assert that any error relating to the aggravated assault charge could accumulate as well. With respect to the claims at issue, we rejected the hearsay claim relating to Ex-Boyfriend for a lack of prejudice, and we rejected the remaining claims on their merits. Because Pontiff "has not successfully demonstrated multiple errors on appeal, there are no errors to accumulate," and the cumulative error doctrine is therefore "inapplicable." *State v. Hunt*, 2025 UT 54, ¶ 83, 582 P.3d 772 (quotation simplified).